UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| ROCHELLE FLYNN,<br><br>Plaintiff,<br><br>v.<br><br>DISTINCTIVE HOME CARE, INC.,<br><br>Defendant. | Civil Case No. 5:13-936 |

## MEMORANDUM OPINION

The Air Force contracted with Distinctive Home Care ("Distinctive") to staff the San Antonio Military Medical Center ("SAMMC"). Distinctive in turn contracted with pediatrician Dr. Rochelle Flynn. A year later, when Distinctive confronted Dr. Flynn with growing concerns about her job performance, Dr. Flynn disclosed she had recently been diagnosed with Asperger's syndrome. Soon, Distinctive fired her.

Dr. Flynn sued Distinctive under the Rehabilitation Act for employment discrimination. Distinctive's summary judgment motion presented this Court with an issue of first impression in the Fifth Circuit: whether independent contractors could sue under the Rehabilitation Act for employment discrimination. The Court sided with the Sixth and Eighth Circuits in answering no, granting Distinctive summary judgment. But on appeal, the Fifth Circuit vacated and remanded, holding for the first time that the Rehabilitation Act permits employment discrimination suits by independent contractors. *See* 812 F.3d 422 (2016).

So the Court now tests the merits of Dr. Flynn's Rehabilitation Act claim. In sum, Dr. Flynn survives summary judgment by clearing—just barely—her burden to produce evidence

with which a reasonable factfinder could conclude Distinctive fired her because of her disability. All of Distinctive's arguments for judgment as a matter of law are factually disputed, legally wrong, or both. Thus the Court will deny Distinctive's summary judgment motion.

## I. Background

After graduating from the George Washington University School of Medicine and attaining double board certification in pediatrics and pediatric emergency medicine, Dr. Flynn spent over a decade as a contract physician at hospitals around the country. From 2002 to 2005 she worked at an Omaha children's hospital. When her contract expired, she moved to the University of Oklahoma's children's hospital, voluntarily resigning after a few weeks. A few months later she started a two-and-a-half-year stint at a Las Vegas hospital before relocating to Texas and working at a Corpus Christi children's hospital for two years. After leaving that job, she spent a few months at two different San Antonio medical centers before joining SAAMC in 2012.

Almost immediately after starting at SAMMC, Dr. Flynn interpersonally clashed with the clinic director. And other coworkers began to report gravely unprofessional interactions with Dr. Flynn—her medical technician, for instance, described Dr. Flynn's responses to "normal stresses" as whipsawing from crying to "laughingly stat[ing] she just needs a gun." Def.'s Summ. J. Mot. app. 3 at Ex. C, ECF No. 23-3. Several patient families also complained, sometimes about comments Dr. Flynn made (like the mother who claimed Dr. Flynn told her to teach her eleven-month-old daughter to "keep her legs closed" to avoid male attention), and other times about perceived professional lapses (like when Dr. Flynn allegedly mistakenly prescribed 600 milligrams of a medication instead of 60 milligrams). *Id.* Dr. Flynn further struggled to show-up on time and to promptly complete patient charts.

2

On May 15, 2013, a psychologist diagnosed Dr. Flynn with Asperger's syndrome. And the next day, when Dr. Flynn's manager called Dr. Flynn with concerns about her job performance, she relayed the diagnosis as an explanation for her behavior. The manager noted the diagnosis "completely changed" his "perspective." Though he didn't say whether his perspective changed for the better or for the worse, he admitted that the situation was "no longer cut and dried," and that "he would have to discuss it further" with Distinctive. Am. Compl. 3, ECF No. 4.

Two weeks later, the Air Force official overseeing SAAMC's contract with Distinctive requested Dr. Flynn's removal, attaching a memorandum substantiating her performance deficiencies. The manager revoked Dr. Flynn's privileges later that day.

The next week, Dr. Flynn asked to be reinstated with accommodations—specifically, a dedicated aide to assist with time management and memory—noting there were "many positive aspects of Asperger's that are assets to make her a very good pediatrician." Am. Comp. 5. But the Air Force refused, so Distinctive declined to restore her employment.

## II. Legal Standard

Rule 56(c) compels summary judgment if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." In assessing whether any genuine factual issues exist, the Court must "draw all reasonable inferences in favor of the nonmoving party" without "mak[ing] credibility determinations or weigh[ing] the evidence"—indeed, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). So ultimately, a nonmovant can survive summary judgment by producing evidence "sufficient to

permit a reasonable factfinder to return a verdict" in its favor. *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) ("[A]ll that is required [to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.").

## III. Analysis

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), provides a cause of action for disabled individuals subjected to employment discrimination by programs receiving federal funds. *See Lollar v. Baker*, 196 F.3d 603, 609-10 (5th Cir. 1999). To obtain relief under the Rehabilitation Act, a plaintiff must prove she "was discriminated against 'solely by reason of [her] disability.'" *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a)). But absent direct evidence of causation, a plaintiff can prove her case circumstantially through the famous burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Silva v. Chertoff*, 512 F. Supp. 2d 792, 813 (W.D. Tex. 2007). First, a plaintiff must establish her prima facie case: that she had a disability; that she was otherwise qualified for her job; that her employer received federal funds; and that she suffered an adverse employment action. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000). Once she makes that prima facie showing, the burden shifts to her employer to articulate a nondiscriminatory reason for the adverse action. *See id.* at 280. And if the employer does, the burden shifts back to the plaintiff to show the employer's asserted justification was pretextual, and that the actual sole justification was discriminatory. *See id.*

But at the summary judgment stage, that three-step collapses into one: "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is

4

false, may permit [a reasonable] trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

Dr. Flynn clears that hurdle. To start, she provides a letter from her psychiatrist documenting her diagnosis and its effects, *see* Letter from Dr. Lyudmila Hartt (Sept. 22, 2014), ECF No. 26-5, based on which the Court finds Asperger's constitutes a disability under § 504 of the Rehabilitation Act.[1] Her educational background and employment history supports her qualifications for the job: numerous other hospitals employed her over the past decade, plus she continued working for another San Antonio hospital well after her diagnosis, and well after Distinctive terminated the contract at issue here. *See, e.g.*, Pl.'s Resps. Def. 1st Set Interrogs., ECF No. 27-4 at 28–31. Distinctive does not deny that it receives federal funds through its contract with the Air Force, nor that it terminated Dr. Flynn,[2] though it maintains she was terminated because of her deficient performance. *See, e.g.*, Deborah Guynn Decl. ¶ 12, ECF No. 23-3. And though Dr. Flynn does not have much to show that this asserted justification is false, she does have her manager's statements—weeks before her termination—that her diagnosis "totally chang[ed]" his "perspective" on her continued employment such that it was no longer "cut and dry" and required further discussions with Distinctive. *See, e.g.*, Rochelle Flynn Dep. Tr. 203:16–204:14, ECF No. 27-2. At the summary judgment stage, the Court can neither weigh

---

[1] For § 504 purposes, the Rehabilitation Act borrows 42 U.S.C. § 12102(1)'s definition of "disability": "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." Dr. Flynn describes Asperger's as a mental impairment limiting "learning, concentrating, thinking, and communicating," Pl.'s Resp. 13, ECF No. 26, which are all specifically cited by the Equal Employment Opportunity Commission as examples of major life activities. *See* 29 C.F.R. § 1630.2(i)(1)(i) (2019). So the Court concludes Asperger's meets the Rehabilitation Act's definition of "disability," especially since—under the regulation—"[a]n impairment need not . . . significantly or severely restrict . . . a major life activity in order to be considered substantially limiting." *Id.* at (ii); *see also id.* at (iii) ("The primary object of attention . . . should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.").
[2] As should be obvious, termination is an adverse employment action. *See, e.g., Zenor v. El Paso Healthcare Sys.*, 176 F.3d 847, 855 (5th Cir. 1999).

nor credit this evidence; it can only—as it does here—conclude that it could give a reasonable factfinder a legally sufficient basis to find Distinctive fired Dr. Flynn because of her disability. Accordingly, Dr. Flynn defeats Distinctive's summary judgment motion with evidence establishing her prima facie case and suggesting Distinctive's asserted justification for her termination could be false.

None of Distinctive's three arguments for judgment as a matter of law persuade otherwise. First, Distinctive impermissibly ignores Dr. Flynn's characterization of Asperger's as a limit on the major life activities of "learning, concentrating, thinking, and communicating," *see* Pl.'s Resp. 13, ECF No. 26, and instead recharacterizes her disability as limiting the substantial life activity of working, *see* Def.'s Mot. Summ. J. 10-12, ECF No. 23. Since a disability must "substantially limit employment generally" to limit the major life activity of working, *Hileman*, 115 F.3d at 354 (internal quotation marks omitted) (quoting *Bryne v. Bd. of Educ.*, 979 F.2d 560, 565 (7th Cir. 1992)), and since Dr. Flynn continued working for another hospital after her diagnosis, Distinctive gamely tries to persuade the Court that Asperger's is not a disability.

But even if that argument passed the smell test (it doesn't), it fails as a matter of law. Courts do not consider a disability's limitation on the ability to work until after ruling out the disability's limitations on other major life activities, especially activities a claimant specifically identifies. *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726-27 (citing 29 C.F.R. § 1630, App., § 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.")). This is all the more true given the EEOC's guidance that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(i)(1)(iii). "The primary object of attention . . . should be whether covered

entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." *Id.* Distinctive's argument that Asperger's is not a disability falls flat.

Second, Distinctive mischaracterizes the record by claiming Dr. Flynn did not request an accommodation until after Distinctive terminated her contract. To be sure, the record reflects Dr. Flynn first requested an accommodation during a June 7, 2013 conference call with her counsel, her manager, and another Distinctive representative. *E.g.*, James Guynn Decl. ¶ 9, ECF No. 23-4. Yet the record contains conflicting claims about Dr. Flynn's actual termination date: Distinctive says it fired Dr. Flynn on May 30, and held the call to hear out Dr. Flynn's request for reinstatement. *E.g., id.* at ¶ 8. But Dr. Flynn claims Distinctive did not fire her until June 28—in this version, Distinctive merely suspended her on May 30, and suggested she should consider resigning, so she requested the June 7 call as an attempt to save her job. *E.g.*, asdf. So at the very least, the Court cannot determine at this summary judgment stage whether Distinctive fired Dr. Flynn on May 30 or on June 28. And thus the Court cannot determine whether Dr. Flynn's June 7 accommodation request came before or after. Distinctive's contrary assertion misstates the summary judgment record.[3]

---

[3] Another misstatement by Distinctive bears mention, though it doesn't directly support its summary judgment argument: that Dr. Flynn's termination could not constitute employment discrimination since the Air Force official who requested Dr. Flynn's dismissal did so before learning of her Asperger's diagnosis. There is simply no evidence of that. The record shows only that Dr. Flynn told her manager about her diagnosis on May 15, 2013, *see* Pl.'s Resps. Def. Spectrum's 1st Set Interrogs. 5, ECF No. 26-3, and that the Air Force requested her dismissal on May 30, 2013, *see* Deborah Guynn Decl. ¶ 12. Whether or what communications took place between Distinctive and the Air Force within those dates is anyone's guess. Distinctive further mischaracterizes Dr. Flynn's deposition testimony by claiming that Dr. Flynn "admit[ted in her deposition] that the Government did not know she had [Asperger's] when it directed Distinctive to terminate her contract." Def.'s Reply 6, ECF No. 30. A closer reading of her testimony reveals Dr. Flynn merely testified the SAAMC clinic director did not know about Dr. Flynn's diagnosis when she prepared a May 17, 2013 memorandum documenting Dr. Flynn's performance deficiencies. *See* Rochelle Flynn Dep. Tr. 129:13–133:10. In other words, Dr. Flynn's testimony does not shed light on what the clinic director or any other Air Force employee knew or learned before May 30, 2013.

Anyways, that is much ado about nothing. Whether a Rehabilitation Act plaintiff requested an accommodation before or after her termination matters only if her claim concerns her employer's failure to accommodate her disability. *See Dillard v. City of Austin*, 837 F.3d 557, 562 (5th Cir. 2016); *see also Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (noting an employer's obligation to accommodate is only triggered when an employee requests an accommodation). But Dr. Flynn's claim is of a different variety: "that an adverse employment action was motivated by [her] disability." *Dillard*, 837 F.3d at 562. So when Dr. Flynn requested her accomodation is really of no moment.

Finally, Distinctive cannot thwart Dr. Flynn's prima facie case by blaming her termination on the Air Force's request. Though Distinctive never cites any law supporting this argument, the Court can tease-out its gesture to Fifth Circuit cases like *Vance v. Union Planters Corp.*, which held that when two employers engaged in an integrated enterprise are accused of employment discrimination, liability falls to the "entity ma[king] the final decisions regarding employment matters relating to the person claiming discrimination." 279 F.3d 295, 301 (5th Cir. 2002) (internal quotation marks omitted) (quoting *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999)). But the Fifth Circuit recently ruled out application of this "right to control" inquiry in circumstances like these, when the complainant is employed by a staffing agency who contracts with another business. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228 (5th Cir. 2015). Even if the contracting business directed the staffing agency to terminate the complainant, the staffing agency—as the complainant's sole employer—remains liable for any subsequent employment discrimination claim. *Id.* So too here. And Distinctive's related argument that it was contractually bound to fire Dr. Flynn at the Air Force's request fares no better, since "as an employer" receiving federal funds, Distinctive "had an

independent obligation to comply" with the Rehabilitation Act, "and a contractual obligation to discriminate would be unenforceable." *Id.* at 229. Even assuming the Air Force dictated Dr. Flynn's termination, Distinctive remains liable if the termination amounted to employment discrimination.

## IV. Conclusion

Because Dr. Flynn provides evidence establishing a prima facie employment discrimination case and suggesting Distinctive's asserted justification for firing her might be false, the Court will deny Distinctive's summary judgment motion. A separate order follows.

Date: March 25, 2019

Royce C. Lamberth
United States District Judge